RECEIVED
JAN - 6 2006
ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE, LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE-OPELOUSAS DIVISION

| | | |
|---|---|---|
| MARY BOURQUE | * | CIVIL ACTION NO. 05-0051 |
| VERSUS | * | JUDGE HAIK |
| COMMISSIONER OF SOCIAL SECURITY | * | MAGISTRATE JUDGE HILL |

## REPORT AND RECOMMENDATION

This social security appeal was referred to me for review, Report and Recommendation pursuant to this Court's Standing Order of July 8, 1993. Mary Bourque, born April 6, 1972, filed an application for disability insurance benefits on August 21, 2002, alleging disability since November 1, 1994, due to residuals from a herniated disc.[1]

## FINDINGS AND CONCLUSIONS

After a review of the entire administrative record and the briefs filed by the parties, and pursuant to 42 U.S.C. § 405(g), I find that there is not substantial evidence in the record to support the Commissioner's finding that the claimant was not disabled and that this case should be remanded for further proceedings.

---

[1] Claimant was insured for disability benefits through December 31, 1999. (Tr. 12). Thus, she must establish disability on or prior to that date.

In fulfillment of F.R.Civ.P. 52, I find that this case should be remanded for further proceedings, based on the following:

**(1) Residual Functional Capacity ("RFC") Assessment (Physical) dated November 12, 2002**. The SS Analyst 3 determined that claimant could lift 20 pounds occasionally and 10 pounds frequently, could stand/walk/sit for about 6 hours in an 8-hour workday, and had unlimited push/pull ability. (Tr. 21). Her symptoms were found to be partially credible. (Tr. 25).

**(2) Records from Our Lady of Lourdes Hospital dated November 17, 1994 to December 12, 1994**. Claimant was admitted on December 9, 1994, with a diagnosis of herniated disc at L3-4 and L5-S1 on the right. (Tr. 107). On December 9, Dr. Stephen Goldware performed a microsurgical partial hemilaminectomy, foraminotomy, and removal of the herniated disc at these two levels. She was discharged in good condition, and given a prescription for Margesic-H for pain. She was not fit for duty.

**(3) Records from Dr. Stephen Goldware dated November 29, 1994 to July 11, 1995**. On December 19, 1994, Dr. Luiz C. deAraujo reported that claimant had recovered very well from her surgery and was "extremely happy" with the results. (Tr. 117). She was free of radicular pain, and had only mild back pain. He advised her to slowly increase the pace of her activities.

On January 19, 1995, claimant was asymptomatic and doing well. (Tr. 116). She had normal strength and reflexes, and negative mechanical signs. She was discharged.

**(3) Records from Dr. David Muldowny dated October 18, 1999 to September 11, 2002**. On October 18, 1999, claimant complained of pain in the sacral area after falling in her yard two weeks prior. (Tr. 137, 140). Patrick's test was positive bilaterally. (Tr. 137). Forward flexion was limited to about a foot from the floor. She had mild pain on axial compression, pelvic rotation or light percussion. Her reflexes were symmetric. Muscle strength was 5/5. Sensation was grossly intact. Straight leg raising was negative. She had no hamstring tightness.

X-rays of the lumbar spine showed disc space narrowing at L5-S1. There was a bilateral laminectomy defect at L5-S1.

Dr. Muldowny's impression was lumbar sprain. He recommended back exercises, and prescribed Vioxx and Lortab.

On December 3, 2001, claimant returned after not seeing Dr. Muldowny for two years. (Tr. 134). She had had no major medical problems or changes in her symptoms in the interim.

On examination, muscle strength was normal, sensation was intact, and reflexes were symmetric. Dr. Muldowny prescribed physical therapy, Vioxx and Lortab.

On January 3, 2002, claimant reported that physical therapy had not helped very much. (Tr. 131). Dr. Muldowny refilled her medications and scheduled an MRI.

On January 21, 2002, Dr. Muldowny reported that an MRI showed a large right paracentral L5-S1 disc herniation with pressure effect on the S1 nerve root. (Tr. 129-30). She also had a degenerative disc at L4-5 with a small central bulge and an apparent posterior annular fissure. (Tr. 129). Dr. Muldowny's impression was degenerative disc disease of the lumbar spine. He recommended surgery after a discogram.

On May 20, 2002, claimant was still complaining exclusively of back pain with no leg pain. (Tr. 127). On examination, she had minimal tenderness to palpation in the lower lumbar spine. Forward flexion was limited to about 80 degrees with some discomfort, and worse pain after 20 degrees. Muscle strength was 5/5 in both extremities. Deep tendon reflexes were 1 out of 2, ankle and jerks were symmetrical, and sensation was grossly intact.

Dr. Muldowny's impression was degenerative disc disease of the lumbar spine. He believed that in all likelihood, the L5-S1 was claimant's symptom generator, but he wanted to do a discogram to confirm.

On July 22, 2002, Dr. Muldowny reported that claimant's discogram was positive at L4-5. (Tr. 124, 147). He noted that it was painful at L3-4, but non-

concordant. (Tr. 124). The post-discogram CT scan showed a large annular tear in the L3-4 disc posteriorly. (Tr. 124, 149). He opined that if surgery were performed, claimant would need a three-level procedure. (Tr. 124). Claimant reported that she was to the point where she could not live with her pain.

On examination, claimant's muscle strength was 5/5, deep tendon reflexes were 1 out of 2, and sensation was grossly intact. Dr. Muldowny's impression was degenerative disc disease of the lumbar spine. Because of the magnitude of the surgery, he wanted to try an epidural first.

On July 22, 2002, Dr. Muldowny reported that claimant did not want to have the epidural injection, and wanted to proceed with surgery. (Tr. 123). She returned on September 11, 2002, for pre-operative counseling. (Tr. 122).

**(4) Records from Dr. Muldowny dated October 1, 2002 to October 16, 2003.** On September 25, 2002, Dr. Muldowny performed a posterior lateral lumbar fusion from L3 to S1, posterior transpedicular segmental instrumentation from L3-S1, and a right posterior iliac crest bone graft. (Tr. 179).

On October 10, claimant was doing reasonably well post-surgery. (Tr. 174). She reported that she was still hurting quite a bit on November 4, but was doing better than the last time. (Tr. 172). On examination, she was neurologically intact. X-rays showed that the instrumentation was in satisfactory condition.

On December 2, claimant was still having pain in the small of her back, and pain and numbness in the left thigh. (Tr. 170). On examination, her muscle strength was 5/5. She had decreased sensation in the left anterior thigh. Straight leg raising produced back pain in the sitting position at about 20 degrees from full extension. X-rays showed good sagittal alignment.

Dr. Muldowny's impression was degenerative disc disease status post-surgery. He prescribed physical therapy.

On February 27, 2003, claimant reported that physical therapy did not really influence her pain. (Tr. 166). On examination, her muscle strength was 5/5, and straight leg raising was negative. X-rays showed bone formation in the disc spaces. Dr. Muldowny stopped therapy, and encouraged her to walk as much as she could.

On June 26, 2003, claimant reported that her back did not really hurt anymore, but that she had pain in the right sacroiliac joint area. (Tr. 163). On examination, the Patrick's test was remarkably positive on the right. X-rays showed that the instrumentation was in satisfactory position, and there was good bone formation of the disc spaces at all three levels.

Dr. Muldowny's diagnoses were degenerative disc disease and S1 joint dysfunction. He noted that she was developing some S1 joint symptoms. He recommended an S1 joint injection, which was performed on July 30, 2003. (Tr.

161).

On August 28, 2003, claimant reported that the S1 joint injection seemed to help, and that her hip did not feel like it was locking up anymore. (Tr. 160). She localized the pain to the lower lumbar and right area. Muscle strength was 5/5 in all muscle groups. Dr. Muldowny refilled her medications and scheduled another injection.

Claimant canceled her appointment on October 16, 2003. (Tr. 158).

**(5) Claimant's Administrative Hearing Testimony**. At the hearing on April 21, 2004, claimant was unrepresented. The ALJ commenced the hearing as follows:

> ALJ: When you were advised that the hearing had been scheduled, it was explained that you had a right to have a lawyer or some similar representative present with you if you wanted one. It was likewise explained that the hearings were designed so that you could be – make your own presentation this morning.

(Tr. 183). That was the extent of the ALJ's advising claimant of her right to representation at the hearing.

Next, the ALJ asked claimant why she waited eight years after her alleged onset date of November 1, 1994, to file her disability application. (Tr. 184). In response, claimant testified that she did not think that she would be able to get

7

disability.

After noting that claimant's insurance status expired on the last day of 1999, the ALJ questioned claimant about her problems at that time. Claimant testified that in December, 1999, her back was hurting so badly that she could not bend and could hardly walk. She said that she spent most of her time "laid up in bed" because she could not get up and walk. (Tr. 184-85). She also stated that a number of times, she had to call her sister who lived across the street to help her go to the restroom. (Tr. 185). She reported that after staying like that for a few years, she decided to see a doctor and have another surgery.

Claimant testified that she still could not pick up her three-year-old child. She stated that she was not able to drive very often in 1999, and was still unable to drive more than occasionally. She stated that her husband and sister did every thing for her, and that her mother came once or twice a week to do the laundry and clean the bathrooms. (Tr. 186).

**(6) Claimant's Husband's Administrative Hearing Testimony**. Claimant's husband testified that claimant struggled "an awful lot." (Tr. 186). He stated that he was hoping that the back surgery would clear up her problems, but it had not.

**(7) The ALJ's Findings**. Claimant argues that: (1) the ALJ erred in failing to properly develop the record with regard to claimant's impairments, limitations,

8

treatment, and past relevant work at the hearing, and (2) the ALJ's RFC assessment was unsupported by evidence and internally inconsistent. Because I find that the ALJ failed to fully and fairly develop the record, I recommend that this case be **REMANDED** for further proceedings.

As to the first argument, claimant asserts that the ALJ failed to develop the record regarding her impairments, limitations, treatment, and past relevant work at the hearing. (rec. doc. 8, p. 2). It is well established that the ALJ owes a duty to a claimant to develop the record fully and fairly to ensure that his decision is an informed decision based on sufficient facts. *Brock v. Chater*, 84 F.3d 726, 728 (5th Cir. 1996). When a claimant is not represented by counsel, the ALJ owes a heightened duty to "scrupulously and conscientiously probe into, inquire of, and explore for all relevant facts." *Id.*, citing *Kane v. Heckler*, 731 F.2d 1216, 1219 (5th Cir. 1984). However, to merit reversal of the ALJ's decision, a claimant who does not validly waive his right to counsel must prove that he was thereby prejudiced. *Id.*; *Gullett v. Chater*, 973 F.Supp. 614, 621 (E.D. Texas 1997).

The Commissioner argues that claimant's waiver was valid because the Social Security Administration had sent numerous written notices to her regarding her right to counsel at the hearing. (rec. doc. 9, p. 3). The record reflects that the SSA did notify claimant of her right to counsel in writing and that claimant did sign a waiver

of representation. (Tr. 30-31, 32, 36, 45, 51, 57). However, the ALJ did not adequately advise her of her right to counsel orally at the hearing. In fact, he did not even give her the opportunity to state whether she was willing to waive her right to counsel. (Tr. 183-84).

In support of claimant's argument that the ALJ failed to fully advise her of the right to counsel, she cites *Gullet, supra,* in which the court stated as follows:

> To ensure valid waiver of counsel, the ALJ must notify the social security claimant of the following: (1) the manner in which an attorney can aid in the proceedings, (2) the possibility of free counsel or a contingency arrangement, and (3) the limitation of attorney fees to twenty-five percent of past due benefits and the required court approval of the fees. *Clark v. Schweiker,* 652 F.2d 399, 403 (5th Cir.1981); *see also Binion v. Shalala,* 13 F.3d 243, 245 (7th Cir.1994); *Thompson v. Sullivan,* 933 F.2d 581, 584 (7th Cir.1991).
>
> ***
>
> Furthermore, notice should generally be provided in writing prior to a hearing. The ALJ should then provide oral notification at the hearing to "ensure[ ] that a claimant who appears *pro se* at a hearing has been made aware of the options for obtaining counsel so that her or his waiver is knowingly and intelligently effected." [*Frank v. Chater,* 924 F.Supp. 416 (E.D.N.Y. 1996] at 425. The ALJ should also inquire as to whether the claimant had a meaningful opportunity to secure counsel and, if not, consider adjourning the hearing to provide that opportunity. *Id.* at 426.

*Id.* at 620-21. *See also,* HALLEX I-2-65-2 (A), which provides as follows:

> The ALJ will open the hearing with a brief statement explaining how the hearing will be conducted, the procedural history of the case, and the issues involved. In supplemental hearings, the ALJ need only identify

10

> the case, state the purpose of the supplemental hearing, and describe the issue(s) to be decided.
>
> Generally, the content and format of the opening statement are within the discretion of the ALJ. However, if the claimant is unrepresented, the ALJ must ensure that the claimant is capable of making an informed choice about representation. For example, the ALJ should ask an unrepresented claimant the following questions on the record:
>
> 1. Did you receive the hearing acknowledgment letter and its enclosure(s)? (If not, the ALJ will provide the claimant with a copy and the opportunity to read the letter.)
>
> 2. Do you understand the information contained in that letter concerning representation? (If not, the ALJ will explain the claimant's options regarding representation, as outlined in the acknowledgment letter. Specifically, the ALJ will explain the availability of both free legal services and contingency representation as well as access to organizations that assist individuals in obtaining representation.
>
> ***
>
> Once the ALJ has determined that the claimant is capable of making an informed choice, he or she will secure, on the record, the claimant's decision concerning representation. The ALJ will also enter into the record the acknowledgment letter and enclosure(s) sent to an unrepresented claimant only if the claimant elects to proceed pro se at the time of the hearing.

The record reflects that the ALJ failed to adequately advise claimant of her right to counsel at the hearing. None of the guidelines cited in *Gullet* and HALLEX were followed by the ALJ. In fact, the transcript shows that the hearing lasted only five minutes, and that the transcript was a mere four pages long. (Tr. 183-86). Thus, the undersigned finds that claimant did not validly waive her right to counsel.

11

However, the claimant must, in addition, show that she was prejudiced as a result of a scanty hearing. *Kane*, 731 F.2d at 1219; *Shave v. Apfel*, 238 F.3d 592, 597 (5th Cir. 2001). Prejudice can be established by showing that additional evidence would have been produced if the ALJ had fully developed the record, and that the additional evidence might have led to a different decision. *Newton v. Apfel*, 209 F.3d 448, 458 (5th Cir. 2000).

In support of her argument that she was prejudiced, claimant asserts that, at the very least, the ALJ should have re-contacted Dr. Goldware to request clarification of his opinion that claimant was unfit for duty, including the length of time that she was unable to work and any specific limitations resulting from her back injury. (rec. doc. rec. 8, p. 7; rec. doc. 10, p. 4). Additionally, she argues that an attorney would have questioned her and her husband more thoroughly regarding her impairments, her limitations resulting therefrom, the different treatment modalities used to alleviate her symptoms, and the physical and mental demands of her past work relative to the time period in question. (rec. doc. 8, p. 4).

At the hearing, the ALJ failed to ask claimant even the most basic questions regarding her education or work background. (Tr. 183-86). He scarcely touched on the degree of her impairment or the extent of her limitations. (Tr. 184-86). This five-minute, four-page transcript indicates that the ALJ did not even comply with the bare

requirements for a valid hearing. *See, Kane*, 731 F.3d at 1219-20 (ALJ failed to develop facts fully and fairly in five minute hearing).

It seems entirely plausible that had the record been fully and fairly developed, claimant might have been able to adduce evidence that might have effected the outcome of this case. Dr. Muldowny's records indicate that claimant was experiencing back pain in October 19, 1999, which was prior to the expiration of the disability insurance period. (Tr. 136). The records show that claimant subsequently had to undergo a three-level fusion in 2002, but do not indicate the extent of claimant's disability prior to that time. (Tr. 179). Given the medical reports and claimant's complaints of pain, the ALJ should have inquired further into the existence or non-existence of claimant's disability. *Id.* at 1220. Thus, I find that claimant has shown prejudice due to the ALJ's failure to fully and fairly develop the record.

Accordingly, the undersigned recommends that this case be **REMANDED** to the Commissioner for further administrative action pursuant to the fourth sentence of 42 U.S.C. § 405(g). This includes, but does not limit, sending the case to the hearing level with instructions to the Administrative Law Judge to obtain an opinion from Dr. Stephen Goldware or Dr. David Muldowny as to the extent of claimant's impairment on or before December 31, 1999. Claimant shall be afforded the opportunity to submit additional evidence and to testify at a supplemental hearing.

Inasmuch as the remand recommended herein falls under sentence four of Section 405(g), any judgment entered in connection herewith will be a "final judgment" for purposes of the Equal Access to Justice Act (EAJA). See, *Richard v. Sullivan*, 955 F.2d 354 (5th Cir. 1992) and *Shalala v. Schaefer*, 509 U.S. 292 (1993).

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and F.R.Civ.Proc. 72(b), parties aggrieved by this recommendation have ten (10) business days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within ten (10) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FACTUAL FINDINGS AND/OR THE PROPOSED LEGAL CONCLUSIONS REFLECTED IN THIS REPORT AND RECOMMENDATION WITHIN TEN (10) DAYS FOLLOWING THE DATE OF ITS SERVICE, OR WITHIN THE TIME FRAME AUTHORIZED BY FED.R.CIV.P. 6(b), SHALL BAR AN AGGRIEVED PARTY FROM ATTACKING THE FACTUAL FINDINGS OR THE LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT COURT, EXCEPT UPON GROUNDS OF PLAIN ERROR. *DOUGLASS V. UNITED SERVICES AUTOMOBILE ASSOCIATION*, 79 F.3D 1415 (5TH CIR. 1996).**

Signed this 6 day of January, 2006 at Lafayette, Louisiana.

C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE

COPY SENT:
DATE: 1-6-06
BY: ga
TO: RTH
CMH

15